ORIGINAL

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

JAN 1 9 2011

CLERK, U.S. DISTRICT COURT
By _____
Deputy

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

TEMI KAY BLACKWELL,                        §
    PLAINTIFF,                             §
                                           §
v.                                         §   CIVIL ACTION NO. 4:10-CV-84-Y
                                           §
MICHAEL J. ASTRUE,                         §
COMMISSIONER OF SOCIAL SECURITY,           §
    DEFENDANT.                             §

## FINDINGS, CONCLUSIONS AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE
## AND
## NOTICE AND ORDER

This case was referred to the United States Magistrate Judge pursuant to the provisions of

Title 28, United States Code, Section 636(b).  The Findings, Conclusions and Recommendation

of the United States Magistrate Judge are as follows:

### FINDINGS AND CONCLUSIONS

### I. STATEMENT OF THE CASE

Plaintiff Temi Kay Blackwell ("Blackwell") filed this action pursuant to Sections 405(g)

and 1383(c)(3) of Title 42 of the United States Code for judicial review of a final decision of the

Commissioner of Social Security denying her claim for disability insurance benefits[1] under Title

II of the Social Security Act ("SSA").  In July 2008,[2] Blackwell filed an application for disability

---

[1] Blackwell's insured status for disability insurance benefits expires on December 31, 2012.  (Tr. 8.)

[2] Although the ALJ states that Blackwell filed her application for disability insurance benefits in July 2008, her application is dated in August 2008.  (Tr. 108-12; *see* Tr. 121.)

1

insurance benefits alleging that she became disabled on April 1, 2008.[3] (Transcript ("Tr.") 8, 109-13, 121.) Her application was denied initially and on reconsideration. (Tr. 8, 59-63, 67-70.) The ALJ held a hearing on June 12, 2009 and issued a decision on September 17, 2009 that Blackwell was not disabled. (Tr. 5-56.) Blackwell filed a written request for review, and on November 20, 2009 the Appeals Council denied her request for review, leaving the ALJ's decision to stand as the final decision of the Commissioner. (Tr. 1-4, 107.)

## II. STANDARD OF REVIEW

Disability insurance is governed by Title II, 42 U.S.C. § 404 *et seq*. The SSA defines a disability as a medically determinable physical or mental impairment lasting at least twelve months that prevents the claimant from engaging in substantial gainful activity. 42 U.S.C. §§ 423(d), 1382c(a)(3)(A); *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). To determine whether a claimant is disabled, and thus entitled to disability benefits, a five-step analysis is employed. 20 C.F.R. § 404.1520 (2010). First, the claimant must not be presently working at any substantial gainful activity. Substantial gainful activity is defined as work activity involving the use of significant physical or mental abilities for pay or profit. 20 C.F.R. § 404.1527. Second, the claimant must have an impairment or combination of impairments that is severe. 20 C.F.R. § 404.1520(c); *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985), *cited in Loza v. Apfel*, 219 F.3d 378, 392 (5th Cir. 2000). Third, disability will be found if the impairment or combination of impairments meets or equals an impairment listed in the Listing of Impairments ("Listing"), 20 C.F.R. Pt. 404, Subpt. P, App. 1. 20 C.F.R. § 404.1520(d). Fourth, if disability

---

[3] At the hearing before the ALJ, Blackwell amended her alleged onset of disability date to June 1, 2007. (Tr. 8.)

2

cannot be found on the basis of the claimant's medical status alone, the impairment or impairments must prevent the claimant from returning to his past relevant work. *Id.* § 404.1520(e). And fifth, the impairment must prevent the claimant from doing any work, considering the claimant's residual functional capacity, age, education, and past work experience. *Id.* § 404.1520(f); *Crowley v. Apfel,* 197 F.3d 194, 197-98 (5th Cir.1999). At steps one through four, the burden of proof rests upon the claimant to show that he is disabled. *Crowley,* 197 F.3d at 198. If the claimant satisfies this responsibility, the burden shifts to the Commissioner to show that there is other gainful employment the claimant is capable of performing in spite of his existing impairments. *Id.*

A denial of disability benefits is reviewed only to determine whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *Hollis v. Bowen*, 837 F.2d 1378, 1382 (5th Cir. 1988). Substantial evidence is such relevant evidence as a responsible mind might accept to support a conclusion. *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). It is more than a mere scintilla, but less than a preponderance. *Id.* A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision. *Id.* This Court may neither reweigh the evidence in the record nor substitute its judgment for the Commissioner's, but will carefully scrutinize the record to determine if the evidence is present. *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir. 2000); *Hollis*, 837 F.2d at 1383.

## III. ISSUES

1. Whether the ALJ applied the correct legal standard in weighing the treating source opinion.

2. Whether the ALJ's determination as to Blackwell's mental residual functional capacity ("RFC") is erroneous because the ALF failed to consider Blackwell's anxiety disorder in such determination.

## IV. ADMINISTRATIVE RECORD

### A. Relevant Treatment History[4]

#### 1. Treating Psychiatrist, Ross Tatum, M.D. ("Tatum")

Blackwell began seeing Tatum in December 2006. (Tr. 294-299.) Tatum diagnosed Blackwell with severe, recurrent major depressive disorder, rated her GAF[5] score at 60,[6] and prescribed Cymbalta to her. (Tr. 296.) On January 22, 2007, Tatum noted that Blackwell reported that she was "feeling some better" on the medication but that she "[f]eels anxious at times and still has periods of depression and anxiety" and "feels hopeless at times." (Tr. 293.) He rated her GAF score at 63.[7]

In February 2007, Tatum noted that Blackwell was feeling better but was experiencing a depressed mood, low energy, poor concentration, and psychomotor retardation - symptoms which were moderately impairing Blackwell's daily functions. (Tr. 292.) Thereafter, on April

---

[4] The Court will only review the treatment history that is relevant to the issues before the Court.

[5] A Global Assessment of Functioning or GAF score is a standard measurement of an individual's overall functioning level with respect to psychological, social, and occupational functioning. AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed. 1994) (DSM-IV).

[6] A GAF score of 51 to 60 reflects some moderate symptoms such as a flat affect, circumstantial speech, and occasional panic attacks or moderate difficulty in social, occupational, or school functioning. DSM-IV at 34.

[7] A GAF score of 61 to 70 reflects some mild symptoms such as a depressed mood or mild insomnia or some difficulty in social, occupational, or school functioning. DSM-IV at 34.

26, 2007, Tatum rated Blackwell's GAF at 62 and noted that Blackwell reported feeling "clearly better." (Tr. 291; *see* Tr. 290-91.) On May 24, 2007, Tatum noted that Blackwell was still depressed and her mood was "no better." (Tr. 289.)

Blackwell returned to see Tatum on June 25, 2007. (Tr. 286-87.) Tatum noted that Blackwell's mood was clearly better, she was irritable and withdrawn at times, and had "anxious shaking periods that last 20 plus minutes." (Tr. 286.) Blackwell also indicated that almost immediately after starting "Lamictal 6.25 mg" she felt her depression had lifted but that she had been easily irritated and had episodes of anxiety where she shook uncontrollably. (Tr. 287.) She also stated that she had noticed an increase in energy, was exercising 45 minutes every day, but was having some "serious lows" in which she totally secluded herself. (Tr. 287.)

In July 2007, Tatum noted that Blackwell was still "slightly depressed" and had no manic symptoms. (Tr. 279.) He rated her GAF score at 62 and continued to diagnose her with severe, recurrent major depression and "ruled out bipolar disorder." (Tr. 279.) In progress notes dated August 31, 2007, Tatum stated that Blackwell's mood was better but that she was irritable and "clinching [sic] her teeth." (Tr. 277; *see* Tr. 277-78.) Tatum changed his diagnosis of Blackwell's condition to "Bipolar Disorder" and rated her GAF score at 64. (Tr. 277.)

Tatum continued to see Blackwell approximately every month from September 20, 2007 through May 22, 2009.[8] Treatment notes during this time period indicate that Blackwell's symptoms included audio, sensory, and visual hallucinations; anxiety; agitation; teeth clenching;

---

[8] Specifically, Blackwell saw Tatum on September 20, 2007 (Tr. 276); October 26, 2007 (Tr. 275); November 6, 2007 (Tr. 273); December 11, 2007 (Tr. 269); February 20, 2008 (Tr. 265); April 25, 2008 (Tr. 264); May 27, 2008 (Tr. 261); June 27, 2008 (Tr. 259); July 17, 2009 (Tr. 258); August 26, 2008 (Tr. 257); September 29, 2008 (Tr. 255); October 20, 2008 (Tr. 254, 316-17); November 21, 2008 (Tr. 319); December 23, 2008 (Tr. 320); January 29, 2009 (Tr. 321); April 24, 2009 (Tr. 322); and May 22, 2009 (Tr. 334).

feeling of bugs on her skin at night; hand tremors; arm jerking; racing thoughts; rapid speech; inability to concentrate; energy surges; forgetfulness; decreased need for sleep; difficulty sleeping to sleeping too much; restlessness; unstable mood; weight gain; and "[n]on-[s]erious thoughts of death/suicide." (*See, e.g.*, Tr. 254-55, 257-59, 261, 264-65, 269, 273, 275-76, 316-17, 319-22, 334.) Her GAF score ranged from 50[9] to 65 (Tr. 254-55, 258-59, 261, 264-65, 267, 269, 316, 319, 320, 334.)

In a letter dated May 29, 2009, Tatum stated, "It is my opinion that Ms. Blackwell is incapable of sustaining any type of eight hour a day, five day a week employment for fifty weeks a year." (Tr. 310.) He indicated that she had been diagnosed with Bipolar Disorder Type I and, although she had shown improvement at times, such periods of improvement had not been sustained. (*Id.*) Tatum further stated:

> At this point, because of her ongoing symptoms, Ms. Blackwell basically lives the life of an involuntary recluse. Her symptoms remain severe despite numerous med trials and compliance with therapy. Contributing factors include severe teen trauma and a family history of severe psychiatric problems (her dad has psychotic symptoms, and her son also has severe bipolar symptoms with psychotic features).

(Tr. 310.)

Tatum also completed a "Mental Source Statement—Impairment Listing and RFC" ("Mental Source Statement") dated May 29, 2009. In the Mental Source Statement, Tatum opined that Blackwell was moderately limited in her ability to 1) maintain attention and concentration for extended periods; 2) sustain an ordinary routine without special supervision; and 3) work in coordination with or proximity to others without being distracted by them. (Tr.

---

9 A GAF score of 41 to 50 reflects serious symptoms such as suicidal ideation, severe obsessional rituals, and frequent shoplifting or any serious impairment in social, occupational, or school functioning. DSM-IV at 34.

312.) Tatum further found that Blackwell was markedly limited in her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances and complete a normal work day and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 312.) Tatum noted that his conclusions were supported by the following evidence: (1) Blackwell typically only "leaves the house for doctors [sic] appointments due to anxiety" and does not even grocery shop "for the most part" and (2) she suffers from social anxiety, has not attended church in two and a half years and cannot attend her husband's work functions with him. (Tr. 312.)

Tatum indicated in the Mental Source Statement that he had seen Blackwell almost monthly since December 2006. (Tr. 313.) He scored Blackwell's current GAF at 50 and noted that her highest GAF during the past year was 64. He further opined that she suffered from the following symptoms: 1) anhedonia or pervasive loss of interest in almost all activities; 2) appetite disturbance with a change in weight; 3) sleep disturbance; psychomotor agitation or retardation; 4) decreased energy; 5) feeling of guilt or worthlessness; 6) hallucinations, delusions or paranoid thinking; 7) hyperactivity; 8) flight of ideas; and 9) easy distractibility. (Tr. 313-14.)

In addition, Tatum opined in the Mental Source Statement that Blackwell was moderately restricted in her activities of daily living; had moderate difficulties in maintaining concentration, persistence, or pace; had extreme difficulties in maintaining social functioning; and marked episodes of decompensation of extended duration. (Tr. 314.) He stated that Blackwell was

incapable of working eight hours a day, five days a week[10] for fifty weeks a year and that she would miss more than three days a month due to her impairments. (Tr. 315.)

After the ALJ issued his decision denying Blackwell's claim for disability and prior to the Appeal's Council denying Blackwell's request for review, Tatum wrote another letter, dated October 1, 2009, which Blackwell submitted to the Appeals Council. (Tr. 4.) In this letter, Tatum stated, *inter alia,* the following:

> It has come to my attention that Ms. Blackwell was turned down for Social Security Disability Benefits. Apparently, the court needed more than the current opinion of the treating physician. My current opinion represents a summary opinion that encapsulates her current condition and the history of my treatment of Ms. Blackwell from January of 2007 to the current date. She has had times in which she appeared better in my office. Intermittently higher GAF scores noted in the record are not representative of her long-term level of functioning. Ms. Blackwell's mood changes abruptly. In a sense, she has always put on her "game face" in order to make it to my office. Unfortunately, for a while that served to distort my perceptions of her level of functioning. Now that our treatment relationship has continued, I am quite sure of her severe level of impairment.

> Furthermore, the purpose of the medical record from my perspective is to document why I make particular medical recommendations. The documentation of the severity of the symptoms may wax and wane due to a variety of reasons. For instance, the focus of the twenty minute visit may be on social issues as opposed to specific symptoms. If the goal was to document symptoms solely for a disability examiner, then the symptoms that an examiner would find significant would be more thoroughly explored to facilitate that examiner's purposes.

> Once again, it is my professional opinion that from the beginning of the time of my treatment with Ms. Blackwell to the present time, she has been unable to function consistently with co-workers, supervisors, and the general public as she has been, and is unable to, [sic] interact routinely with those outside her immediate family. She basically currently gets out of the house only to attend appointments. It is an effort for her to even go to the mail box. Her anxiety about leaving home is severe. I might add that these symptoms, and the inability to

---

[10] The form actually states "five days a month," which the Court assumes is a typographical error and should read "five days a week." (Tr. 315.)

function socially at all, are a severe disappointment for Ms. Blackwell. She is otherwise an intelligent and pleasant woman.

(Tr. 335-36.)

### 2. Treating Licensed Counselor, Terry Mizel, LPC ("Mizel")

Blackwell was also treated by Mizel, a licensed counselor, from June 2008 through May 2009. (Tr. 209-10, 333.) In a Mental Source Statement dated June 2, 2009, Mizel opined that Blackwell was moderately limited in her ability to understand, remember, and carry out very short and simple instructions; carry out detailed instructions; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; make simple work-related decisions; and complete a normal work day and work week without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others. (Tr. 328-30.) In addition, Mizel found that Blackwell was markedly limited in her ability to understand and remember detailed instructions; maintain attention and concentration for extended periods; work in coordination with or proximity to others without being distracted by them; act appropriately with the general public; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. (*Id.*) Mizel indicated that he had been treating Blackwell for two years on a weekly basis. (Tr. 330.)

Mizel diagnosed Blackwell with bipolar disorder, assigned her a GAF score of 35[11] and noted that her highest GAF score the past year was 60. (Tr. 330.)

In the Mental Source Statement, Mizel further noted that Blackwell experienced the following symptoms: anhedonia or pervasive loss of interest in almost all activities; sleep disturbance; psychomotor agitation or retardation; decreased energy; feeling of guilt or worthlessness; difficulty concentrating or thinking; hallucinations, delusions or paranoid thinking; hyperactivity; flight of ideas; decreased need for sleep; and easy distractibility. (Tr. 330- 31.) Mizel opined that Blackwell was markedly restricted in her activities of daily living; had marked difficulties in maintaining social functioning and concentration, persistence, or pace; and had marked episodes of decompensation of extended duration. (Tr. 331.) He stated that Blackwell was incapable of working eight hours a day, five days a week[12] for fifty weeks a year and would miss more than three days per month due to her impairments. (Tr. 332.)

After the ALJ issued his opinion denying Blackwell's claim for benefits and prior to the Appeals Council's denial of her request for review, Mizel wrote a letter dated October 27, 2009 in which he stated, *inter alia*:

> When the complication of discovering the correct dosage, combination and medication is seen in the context of the diagnosis of Bi Polar I; which in itself has a primary feature of mood swings from depression to mania, Ms[.] Blackwell appears to have a history of mixed episodes which include depressed mood associated with poor sleep, energy, interests, concentration, and appetite. These symptoms would be mixed with decreased need for sleep, racing thoughts, distractibility and short term increase in goal directed activity. These symptoms are extremely unpredictable and a rapid change could even occur multiple times

---

[11] A GAF score of 31 to 40 reflects some impairment in reality testing or communication or major impairment in several areas such as work or school, family relations, judgment, thinking, or mood.

[12] Again, the form actually states "five days a month," which the Court assumes is a typographical error and should read "five days a week." (Tr. 332.)

in the same day. I find it difficult that someone with Ms[.] Blackwell's symptoms would be able to maintain employment for any period of time or function successfully with coworkers, supervisors or the general public. It also appears that Ms[.] Blackwell's symptoms may even be increased when exposed to stimuli such as unfamiliar situations, expectations of others and strangers. These seem to have the effect of escalating racing thoughts and flight of ideas, which of course, decreases her ability to focus. This has intensified her desire to isolate and retreat to a place that she feels safe. In my opinion, considering the ongoing search for a long term effective medication and severity of the symptoms; it is not possible for Ms[.] Blackwell to maintain any type of long term employment.

(Tr. 337.)

## B. **ALJ Decision**

In his September 17, 2009 decision, the ALJ noted that Blackwell met the disability insured status requirements under Title II of the SSA through December 31, 2012. (Tr. 10.) He stated that Blackwell had not engaged in any substantial gainful activity since June 1, 2007, her alleged onset date of disability. (*Id.*) The ALJ further found that Blackwell had the severe impairments of bipolar disorder, hypothyroidism, and hypokalemia. (*Id.*)

Next, the ALJ held that none of Blackwell's impairments or combination of impairments met or equaled the severity of any impairment in the Listing. (Tr. 10-11.) As to Blackwell's RFC, the ALJ stated:

> The claimant has the ability to obtain, perform, and maintain the following residual functional capacity: lift and carry fifty pounds occasionally and twenty-five pounds frequently; sit throughout an eight-hour workday; stand and walk (individually or in combination) throughout an eight-hour workday; and otherwise perform the full range of medium work, except she can have no more than incidental contact with the public, and she can perform jobs with a reasoning development level of one or two (as defined in the *Dictionary of Occupational Titles*).

(Tr. 11.) In making this determination, the ALJ went through the medical evidence in the record, stating, *inter alia*:

11

I also considered opinion evidence in accordance with 20 C.F.R. § 404.1527 and SSRs 96-2p, 96-5, and 06-3p. . . .

The claimant received the bulk of her treatment for depression and anxiety from Dr. Ross J. Tatum, M.D. In June 2007 she indicated to him that her mood was better but that she was irritable at times, with periods of anxious shaking that often lasted in excess of twenty minutes. In handwritten notes provided to Dr. Tatum, the claimant related that "[a]lmost immediately" after starting Lamictal "I felt my depression had lifted." She also noted increased irritability and uncontrollable shaking, along with "a very noticeable increase in energy." She wrote she was exercising for forty-five minutes every day. At that time Dr. Tatum assessed the claimant with a Global Assessment of Functioning ("GAF") score of 63.

From June 2007 through January 2009, the claimant continued to treat with Dr. Tatum. Her complaints generally consisted of depression, anxiety, shakiness, and stress pertaining to family finances, her children, and a dental hygienist examination she was preparing to take. She denied any hallucinations or delusions, with the one exception of telling Dr. Tatum that she sometimes felt bugs at night. She also recalled intermittently hearing voices from the age of ten years old through the present. During this time period, the claimant's GAF scores ranged from a low of 54 to a high of 65.

Concurrent with her treatment by Dr. Tatum, the claimant began receiving treatment from Mr. Terry Mizel, LPC, on June 3, 2008, for her depression, anxiety, and low self-esteem. . . . On October 7, 2008, Mr. Mizel completed a *Medical Source Statement—Impairment Listing and RFC*. In that document Mr. Mizel noted the claimant suffered from anxiety, racing thoughts, an inability to make simple decisions, symptoms of depression, and poor sleep, which resulted in the claimant's becoming easily fatigued. He also stated the claimant suffered a poor self-image, along with feelings of worthlessness that affected her ability to interact with others.

On May 15, 2008, the claimant presented to Cornerstone Family Medicine for follow-up treatment for her bipolar disorder. She stated she had a mild degree of depression, which was improving. . . .

In 2009 the claimant continued treating with both Dr. Tatum and Mr. Mizel. On April 24, 2009, Dr. Tatum noted the claimant's mood was good and ranked her current symptoms between a zero ("none") and a one ("mild impairment of daily functioning") (on a scale of 0 to 3), with the exception of low energy and distractibility, which each ranged between one and two ("mild to moderate impairment of daily function"). On May 22, 2009, the claimant

presented to Dr. Tatum stating she was very anxious about being in public and that she was hearing voices. He rated her generalized anxiety between a two and a three ("severe impact on daily functioning") but noted she never suffered poor concentration. Subsequently, Dr. Tatum wrote a letter to the claimant's attorney, providing him with a *Mental Source Statement—Impairment Listing and RFC*. The letter advised Mr. Skaar that the claimant was incapable of sustaining any type of work over the course of an eight-hour day for a period of fifty weeks. He noted the claimant experienced periods of improvement but that those periods were not sustained. Consequently, Dr. Tatum noted that despite her numerous medication trials and compliance with therapy, her symptoms remained severe. Dr. Tatum listed severe teen trauma and a family history of severe psychiatric problems as contributing factors in the claimant's condition. The statement completed by Dr. Tatum indicated the claimant "typically only leaves the house for doctors [sic] appointments due to anxiety. Does not even grocery shop for the most part." He went on to write that she cannot even attend her husband's work functions with him and ended by noting that her current GAF score was 50.

On June 2, 2009, Mizel completed another *Mental Source Statement— Impairment Listing and RFC*. In that document he wrote the claimant suffered from poor concentration and racing thoughts. He wrote she also suffered from anxiety, depression, frequent mood swings, bipolar disorder, and an inability to generate and maintain social contacts. Mr. Mizel ranked her current GAF score as 35.

(Tr. 11-13 (internal citations omitted).)

The ALJ further stated:

Despite her bipolar disorder, the medical evidence indicates that therapeutic counseling and medication help control her symptoms. In fact, during most of her sessions with Dr. Tatum, the claimant described feelings of mild depression or of anxiety associated with common, every-day stressors. Significantly, the claimant's GAF scores, as recorded by Dr. Tatum, most often ranged between 60-65, indicating mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well. She even told Dr. Tatum she was going on a seven-day cruise with her husband in January 2008.

In late 2008 and 2009, the claimant's treatment became less structured. The medical evidence indicates she did not treat with Dr. Tatum from January 26, 2009, until April 24, 2009, nor did she receive any treatment from her counselor, Mr. Mizel, from October 21, 2008, until March 24, 2009. It is only following these lengthy gaps in treatment that the claimant's treatment providers completed statements attesting to the severity of her impairment.

13

. . . .

The Social Security Administration's regulations require a special procedure to be followed when assessing the level of severity of mental impairments, which requires evaluation of the claimant's functional limitations in four areas. In this case, based upon the above, I determined that the claimant's mental impairments have mildly restricted her activities of daily living, have created moderate difficulties in maintaining social functioning, have resulted in moderate deficiencies of concentration, persistence, or pace, and have not resulted in any episodes of decompensation. In making these determinations, I gave the claimant the benefit of the doubt regarding her ability to interact with the public. However, I did not find that the claimant's actions in the public setting are severe enough to warrant anything more than a finding of moderate limitation. Therefore, I limited the claimant to having no more than incidental contact with the public, which is quite generous. Likewise, the claimant's ability to concentrate and perform tasks is impaired. The medical evidence substantiates that the claimant exhibited poor concentration. Further, the claimant testified she would often forget what she was doing while performing a task. However, I did not find the objective medical evidence supports a finding of more than a moderate restriction in the area of concentration, persistence, or pace. Therefore, I restricted the claimant to jobs with a reasoning development level of one or two, as defined in the *Dictionary of Occupational Titles*. This limitation, too, is quite generous and gives the claimant the benefit of significant doubt.

In accordance with SSR 96-6p, I considered the administrative findings of fact made by the State Agency medical physician. These opinions are weighed as statements from a non-examining source. I gave the claimant the full benefit of the doubt regarding her subjective complaints, and I found that, in addition to the findings of the State Agency medical physician, the claimant also should not have more than incidental contact with the public. While the evidence does not entirely support the claimant's extensive complaints, some limitations could reasonably be expected as result of her impairment. In reaching this finding, I noted the claimant's subjective complaints at the hearing, the objective findings upon examination, and the longitudinal history of treatment of her conditions. However, even giving the claimant the full benefit of the doubt regarding her subjective impairment, I did not find that this impairment would limit the claimant further. Accordingly, the State Agency opinions are granted significant weight in determining the claimant's functional abilities, as they are well supported by and consistent with the credible evidence.

Ordinarily, a treating physician's opinion regarding a claimant's disability is to be afforded great or controlling weight. In considering such opinions and in

determining the weight to be accorded them, I am to consider the length, nature, and extent of the treatment relationship, the frequency of the examinations, the supportability by other evidence given by the medical source, such as medical signs and laboratory findings, the extent of his explanation, and the consistency with the record as a whole. More weight is to be assigned to the opinions of a specialist. Further, an Administrative Law Judge may reject a treating source's opinion after considering the foregoing factors if he finds there is good reason to do so.

After careful consideration of the evidence, I found that Dr. Tatum's *Mental Source Statement—Impairment Listing and RFC* is inconsistent with the record as a whole and with his own treatment records. Dr. Tatum has treated the claimant since December 2006, and on many of those occasions he noted the claimant was depressed, but she was not experiencing any hallucinations or psychotic symptoms. In fact, his notes indicate the claimant's thoughts were "coherent, logical, and goal directed." Notably, only a few months prior to Dr. Tatum's letter deeming the claimant incapable of sustaining any type of work, his treatment notes show the claimant was "no longer depressed" and that her overall mood was "stable." Therefore, there is good reason to reject Dr. Tatum's opinion, and I afforded it little weight.

Mr. Mizel's treatment records and the remaining medical evidence are also void of any entries that support the significant restrictions and extremely low GAF score contained in his statement. On May 19, 2009, Mr. Mizel wrote that the claimant was mildly anxious. Approximately two weeks later, he indicated the claimant suffered from anhedonia, sleep disturbances, psychomotor agitation or retardation, decreased energy, feelings of guilt or worthlessness, difficulty concentrating or thinking, and hallucinations, delusions, or paranoid thinking. I therefore afforded Mr. Mizel's opinion little weight.

(Tr. 15-17 (internal citations omitted).)

The ALJ opined, based on his RFC assessment, that Blackwell was not able to perform her past relevant work. (Tr. 18.) However, the ALJ found that there were a significant number of jobs in the national economy that Blackwell could perform; thus, she was not disabled. (Tr. 18-19.)

## V. DISCUSSION

Blackwell claims, in essence, that the ALJ erred in rejecting the opinions of Tatum, Blackwell's treating psychiatrist, without applying the required factors in 20 C.F.R. § 404.1527(d) and without good cause. Pl.'s Br. at 14-22. Controlling weight is assigned to the opinions of a treating physician if well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2); *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995); *Bowman v. Heckler*, 706 F.2d 564, 568 (5th Cir. 1983). However, the determination of disability always remains the province of the ALJ, and the ALJ can decrease the weight assigned to a treating physician's opinion for good cause, which includes disregarding statements that are brief and conclusory, unsupported by acceptable diagnostic techniques, or otherwise unsupported by the evidence. *Leggett*, 67 F.3d at 566; *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994). *See also* 20 C.F.R. §§ 404.1527(e), 416.927(e). Conclusory statements to the effect that the claimant is disabled or unable to work are legal conclusions, not medical opinions, and are not entitled to any special significance. *See id.*; *see also Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003).

In *Newton v. Apfel*, the Fifth Circuit Court of Appeals held that "absent reliable medical evidence from a treating or examining specialist, an ALJ may reject the opinion of the treating physician *only* if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in 20 C.F.R. § 404.1527(d)." *Newton*, 209 F.3d 448, 453 (5th Cir. 2000) (emphasis in original). Under the statutory analysis of 20 C.F.R. § 404.1527(d), the ALJ must evaluate the following: (1) examining relationship, (2) treatment relationship, including the length, nature and extent of the treatment relationship, as well as the frequency of the

16

examination(s), (3) supportability, (4) consistency, (5) specialization, and (6) other factors which "tend to support or contradict the opinion." 20 C.F.R. § 404.1527(d); *see also* 20 C.F.R. § 416.927(d); Social Security Ruling ("SSR") 96-6p, 1996 WL 374180, at *3 (S.S.A. July 2, 1996); SSR 96-2p, 1996 WL 374188, at *4 (S.S.A. July 2, 1996).[13]

In this case, the ALJ determined that Blackwell had the RFC to perform the full range of medium work, "except she can have no more than incidental contact with the public, and she can perform jobs with a reasoning development level of one or two."[14]  (Tr. 11.)  In making this determination, the ALJ reviewed the evidence in the record, including the opinions of Tatum.[15] (Tr. 12-18.)  The ALJ, however, chose to, in essence, reject[16] Tatum's opinions.

---

[13] Pursuant to *Newton*, the ALJ is required to perform a detailed analysis of the treating physician's views under the factors set forth in 20 C.F.R. § 404.1527(d) *only* if there is no other reliable medical evidence from another *treating or examining* physician that *controverts* the treating specialist. *See Newton v. Apfel*, 209 F.3d 448, 455-57 (5th Cir. 2000).  An ALJ does *not* have to perform a detailed analysis under the factors in the regulation "where there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another" as well as cases in which "the ALJ weighs the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion." *Id.* at 458; *see Alejandro v. Barnhart*, 291 F. Supp. 2d 497, 507-11 (S.D. Tex. 2003); *Contreras v. Massanari*, No. 1:00-CV-242-C, 2001 WL 520815, at *4 (N.D. Tex. May 14, 2001) ("The Court's decision in *Newton* is limited to circumstances where the administrative law judge summarily rejects the opinions of a claimant's treating physician, based only on the testimony of a non-specialty medical expert who had not examined the claimant.")

[14] Reasoning development level ("RDL") 1 requires the ability to "[a]pply commonsense understanding to carry out simple one- or two-step instructions[ and d]eal with standardized situations with occasional or no variables in or from these situations encountered on the job." DOT, App. C (Rev. 4th ed. 1991).)  RDL 2 requires the ability to "apply commonsense understanding to carry out detailed but uninvolved written or oral instructions[ and d]eal with problems involving a few concrete variables in or from standardized situations." (*Id.*)

[15] The ALJ also rejected Mizel's opinions.  However, Mizel, a licensed professional counselor, is not an "acceptable medical source" whose opinions are entitled to controlling weight. *See Johnson v. Astrue*, No. 3:08-CV-1488-BD, 2010 WL 26469, at *4 (N.D. Tex. Jan. 4, 2010).

[16] As to Tatum's opinion, the ALJ stated, "[T]herefore, there is good reason to reject Dr. Tatum's opinion, and I afforded it little weight." (Tr. 17.)  As to Mizel's opinion, the ALJ stated, "I therefore afforded Mr. Mizel's opinion little weight." (*Id.*)

Based upon a review of the ALJ's decision, the Court finds that the ALJ did follow the statutory analysis before rejecting such opinions. The ALJ specifically listed the factors in 20 C.F.R. § 404.1527(d) and acknowledged his duty to consider such factors in analyzing a treating physician's opinion. (Tr. 17.) As to factors one and two, it is apparent that the ALJ was aware of the examining relationship and treatment relationship between Blackwell and Tatum as he stated that Blackwell "received the bulk of her treatment for depression and anxiety from" Tatum, beginning in December 2006, and went through the time periods that she was treated by Tatum. (Tr. 12, 15-16.) As to factors three, four, and five, the ALJ detailed his reasons for finding Tatum's opinions unsupportable and inconsistent with the other evidence in the record. (Tr. 13-17.) As to the fifth factor, specialization of the treating physician, the ALJ, based on statements in his decision, appears aware that Tatum is a psychiatrist (Tr. 12-17.)

The more problematic issue is, however, whether the ALJ had good cause to reject the treating source opinions of Tatum in assessing Blackwell's RFC. RFC is what an individual can still do despite his limitations.[17] SSR 96-8p, 1996 WL 374184, at *2 (S.S.A. July 2, 1996). It reflects the individual's maximum remaining ability to do sustained work activity in an ordinary work setting on a regular and continuing basis. *Id. See Myers v. Apfel*, 23 8F.3d 617, 620 (5th Cir. 2001). A regular and continuing basis is an eight-hour day, five days a week, or an equivalent schedule. *Id.* RFC is not the least an individual can do, but the most. SSR 96-8p, 1996 WL 374184, at *2. The RFC assessment is a function-by-function assessment, with both exertional and nonexertional factors to be considered, and is based upon all of the relevant

---

[17] The Commissioner's analysis at steps four and five of the disability evaluation process is based on the assessment of the claimant's RFC. *Perez v. Barnhart*, 415 F.3d 457, 461-62 (5th Cir. 2005). The Commissioner assesses the RFC before proceeding from step three to step four. *Id.*

evidence in the case record. *Id.* at *3-5. The responsibility for determining a claimant's RFC lies with the ALJ. *See Villa v. Sullivan*, 895 F.2d 1019, 1023 (5th Cir. 1990). The ALJ will discuss the claimant's ability to perform sustained work activity on a regular and continuing basis, and will resolve any inconsistencies in the evidence. *Id.* at *7.

The ALJ, in making his RFC determination, appears to have rejected the opinions of Tatum for the following reasons: (1) Tatum's notes indicated on many occasions that Blackwell was not experiencing any hallucinations or psychotic symptoms and her thoughts were "coherent, logical, and goal directed;" (2) only a few months before Tatum stated in the Medical Source Statement that Blackwell was incapable of sustaining any type of work, his treatment notes showed that Blackwell was no longer depressed and her overall mood was stable; (3) Blackwell did not seek treatment with Tatum from January 26, 2009 until April 24, 2009; (4) the GAF scores recorded by Tatum most often ranged between 60 and 65, "indicating mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well." (Tr. 13, 17.)

Although there is evidence in the record that supports the ALJ's reasons for rejecting Tatum's opinions as stated in the ALJ's formal decision, Blackwell submitted a letter from Tatum to the Appeals Council *after* the ALJ's decision that explains why the majority of the reasons relied on by the ALJ to reject Tatum's opinions are not valid.[18] The Appeals Council

---

[18] *See Higginbotham v. Barnhart*, 405 F.3d 332, 337-38 (5th Cir. 2005) (stating that a final decision includes the Appeals Council's denial of review and evidence submitted to the Appeals Council is to be considered part of the record for the Court's review); *Rodriquez v. Barnhart*, 252 F. Supp. 2d 329, 336 (S.D. Tex. 2003) ("When the Appeals Council denies review, the ALJ's decision becomes the final decision, but the Court should still consider the entire record, including the new evidence considered by the Appeals Council, when reviewing the ALJ's decision.")

indicated in its denial form letter that it had reviewed these letters. (Tr. 4.) However, the Appeals Council did not provide any explanation as to why it rejected Tatum's letter or explain how there continued to be good cause for rejecting Tatum's opinions. Taken as a whole, the new evidence provided by Tatum after the ALJ's decision is so inconsistent with the ALJ's reasons for rejecting Tatum's opinions that it undermines the ultimate disability determination. Because there is not substantial evidence showing the ALJ had good cause to reject Tatum's opinions, remand is required for proper consideration of the treating source's opinions. *See, e.g., Stewart v. Astrue*, No. 7:07-CV-52-BD, 2008 WL 4290917, at *3-4 (N.D. Tex. Sept. 18, 2008); *Lopez v. Sec'y of Health and Human Servs.*, No. 3:92-CV-0405-D, 1992 WL 317394, at *3-4 (N.D. Tex. Oct. 8, 1992).

Because the Court is remanding the case so that the ALJ can reconsider his RFC determination, the Court will not consider the issue of whether the ALJ properly considered evidence relating to Blackwell's anxiety. The ALJ should consider such evidence on remand.

## RECOMMENDATION

It is recommended that the Commissioner's decision be reversed and remanded for further administrative proceedings consistent with these proposed findings and conclusions.

### NOTICE OF RIGHT TO OBJECT TO PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATION AND CONSEQUENCES OF FAILURE TO OBJECT

Under 28 U.S.C. § 636(b)(1), each party to this action has the right to serve and file specific written objections in the United States District Court to the United States Magistrate Judge's proposed findings, conclusions and recommendation within fourteen (14) days after the party has been served with a copy of this document. The United States District Judge need only

20

make a *de novo* determination of those portions of the United States Magistrate Judge's proposed findings, conclusions and recommendation to which specific objection is timely made. *See* 28 U.S.C. § 636(b)(1). Failure to file, by the date stated above, a specific written objection to a proposed factual finding or legal conclusion will bar a party, except upon grounds of plain error or manifest injustice, from attacking on appeal any such proposed factual findings and legal conclusions accepted by the United States District Judge. *See Douglass v. United Services Auto Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

## ORDER

Under 28 U.S.C. § 636, it is hereby ORDERED that each party is granted until **February 2, 2011** to serve and file written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation. It is further ORDERED that if objections are filed and the opposing party chooses to file a response, the response shall be filed within seven (7) days of the filing date of the objections.

It is further ORDERED that the above-styled and numbered action, previously referred to the United States Magistrate Judge for findings, conclusions and recommendation, be and hereby is returned to the docket of the United States District Judge.

SIGNED January 19, 2011.

_____
JEFFREY L. CURETON
UNITED STATES MAGISTRATE JUDGE

JLC/knv

21